Our first case today is 2016-2206, Genzyme v. Dr. Reddy's Labs. Mr. Pervain, please proceed.  Good morning, Your Honors. We believe here that the Court made several errors of law and clearly erroneous findings of fact, which led to an erroneous determination on the question of obviousness. The first and perhaps most egregious error that we perceived is the fact that the Court concluded that our principal reference, Hendricks, was not analogous prior art. What would be the significance of our agreeing with you on that issue? I think at the very least, Your Honor, that would result in a remand to the District Court, but I think that based on the evidence that's of record in this case, that it would justify a reversal in a finding of obviousness, as this Court has done in several other cases that come up from District Courts on questions of obviousness. As I understood the District Court's opinion, it seems like there would be two hurdles for you. One is to win on the conclusion that it was clearly erroneous to find that Hendricks was not analogous art. And then two, I saw the District Court conclude that even assuming that it is prior art, there were still problems in finding that this invention was obvious in light of that prior art reference. I have two responses to that, Judge. Firstly, our argument was never that Hendricks alone rendered the patent obvious. And if you read the Court's decision, our main combination of references, Hendricks in combination with the 304 patent, is dismissed in one sentence by the judge. He never considered the combination, and when he addressed it in that one sentence, all he says is that Hendricks is not analogous art, and therefore that argument fails. But that's not the question. The question that's being asked is, what about the fact that the trial judge ruled in the alternative? He took up the case of Hendricks being analogous art. What about that? Okay, Hendricks alone? Okay, again, we never argued Hendricks alone. Hold on. The flaw, as I understand it, from the District Court in the combination of Hendricks with 304, is that in his view, based on reading of Hendricks, Hendricks doesn't actually teach one in skill in the arts to consider using clarixophore for mobilizing stem cells. I know you have a counter view of that, and your expert, Dr. Skadden, has a counter view of Hendricks, but nevertheless, I saw, at least in that one paragraph, that even if Hendricks is prior art, there's still all these problems. If that finding is not clearly erroneous, then I don't see what else there really is to say about the 304 combination with Hendricks. Okay, well we believe that to the extent that the court concluded that Hendricks would not lead a person to reasonably expect successful mobilization of stem cells using clarixophore, a CXCR4 antagonist, is clearly erroneous. And we think that's clear from the reference itself. You don't have to go any further than reading the Hendricks reference to see that Hendricks specifically says, and builds a case for why he reaches that result, that the increase in white blood cell count that he perceived when they administered clarixophore to these healthy subjects in a phase one safety study was the result of either one of three possibilities. Well, let's slow down for a second here. I think the challenge that we have here is that this is a fact finding, and the district court already made a fact finding about to what degree was the science of the mechanism of mobilizing stem cells known or uncertain at this time of October 2000. And he found, with I think supporting evidence, that it was quite uncertain, and it was an imperfect science, and there was a lot unknown, and even today the science of stem cell mobilization and all the mechanisms involved is not clearly known. And then when you look at Hendricks, there's a reasonable reading to find that this key paragraph is all about elevating white blood cell count, and that the demargination theory was the primary hypothesis underlying this paragraph about increasing white blood cell counts. And so therefore, there's a story here about SDF1, the primary purpose of SDF1 is the trafficking and chemoattraction of lymphocytes, CXCR4 is a receptor in endothelial cells, and then therefore there's a suggestion here that there is a demargination effect going on here when you use clorexifor for increasing white blood cells. Yes, it also says something about, and or the stem cells from bone marrow, but that ending clause feels like an add-on that doesn't feel connected to the rest of the paragraph in the same way that the demargination theory is the sum and substance of that paragraph. That's my concern, is that there's an alternate reading of this paragraph other than your reading that seems like a reasonable reading of this paragraph. Well again, your honor, I feel firstly that, let's remember the level of skill here is very high. These people are PhD MDs, they've got training in stem cell transplantation, they have training and knowledge of hematopoiesis and the underlying science. That's what the judge said. Right, and then we also have experts saying that when it came to the science of stem cell mobilization it was incredibly uncertain at this time in 2000. Again, the fact that the underlying mechanism is uncertain, and even today, your honors, GCSF, which is the most widely used stem cell transplantation drug, people don't really fully understand the ultimate molecular mechanism, but I don't think that's what's critical here. If you read that section of Hendricks that you're citing to, which is the paragraph on appendix page 12-12288, the article talks and cites to, I'm sorry, the passage talks and cites to articles that were in the prior art, including articles we point to, such as PELID and IUD, that talk specifically about the SDF1CXCR4 axis and how that axis is important to retaining stem cells in the bone marrow. And from that, the article builds to the conclusion that, yes, it can be demargination, but it may also result in stem cell mobilization. And let's remember that while white blood cell count increase was not always a direct proxy for increased stem cell mobilization, it was recognized that it was often accompanied by mobilization of stem cells. So if you saw an increase in WBC, it often indicated that. So a person of ordinary skill reading that and seeing the specific suggestion of these authors would realize that there's a possibility here that this could happen. And all they had to do, the trail was blazed, all they had to do, which is exactly, by the way, what they did, is they went back and they replicated this exact study, but this time with a specific test for the CD34 marker, which indicates the presence of stem cells. So the teaching here is explicit. It's not like it's a suggestion that if you do this, maybe you will mobilize stem cells. They're saying that you don't have to, in other words, you don't have to reach that inference. They tell you specifically in the article, this may be causing an increase in stem cell mobilization from the blood. And to me, based on prior case law that I've seen in this court, Pfizer, Apotex, and others that have said that, look, it may be a terrific contribution to science to go back and replicate a study and show that something that people had predicted, in fact, is true. But that's not invention. And it's our position that that's exactly what happened here. This exact study was simply replicated, and they showed that what these gentlemen predicted to be true was, in fact, true. And that should not rise to the level of obviousness. And to the extent the court made findings to the contrary on that, I think they're clearly erroneous. But certainly the ultimate conclusion of obviousness being one of law is certainly wrong under those circumstances. Your Honors, so, again, as I pointed out, our ultimate argument, principal argument, was not Hendricks alone, although I've now talked about that, and the judge did address it alone, and I agree with what Your Honor said on that. But he never really addressed the combination of 304 with Hendricks. And I think that is also error, and he should have considered our main argument. And the way he addressed 304 was to say it was a different blocking agent. It involved VL4, and it wasn't. It was an antigen for VL4. Well, he didn't consider 304 with Hendricks because he thought Hendricks was irrelevant. Correct. Why would he have considered it? Well, for the same reason, perhaps, that he considered Hendricks. He could have said, even if, and he could have gone on. But he didn't. I agree he didn't do it because he didn't consider it relevant. But he did address 304. And I agree to the extent that he addressed 304, he was accurate in what he described, but it wasn't what we were relying on it for. We were relying on it for the fact, the suggestion made in the 304 patent, that, look, based on what we found in 304 with this other blocking agent, you could find that it strongly suggests, is the way they put it in that patent, it strongly suggests that if you combine two stem cell mobilizers with different mechanisms of action, one being the GCSF, which was in the prior art and everybody had been using it, and that caused it by what we call proliferation, meaning basically just generating more stem cells in your marrow to the point where it became so packed that they just left the marrow. And another one, such as a blocker, which works by a different mechanism, which actually severs the tether between the stem cells and the bone marrow, the SDF1 and the bone marrow stromal cells, if you use those two together, you will get better progenitor cells, better stem cells, and more stem cells. So they predicted what would happen if you combine these two, and lo and behold, that's exactly what does happen. That's exactly what is the effect of using Plerixifor in combination with GCSF. And again, GCSF was in the prior art. Let's remember, there's only three steps in this claim, right? One is administering GCSF, then administering Plerixifor exactly in the sequence that's suggested in 304, and then harvesting. Well, there's no doubt GSF was in the prior art. There's no doubt that harvesting was well known in the prior art. So the only question is, would it have been obvious to also add a second mobilizer? And again, combination mobilization techniques were also in the prior art. So under these circumstances, we think the judge was clearly wrong not to find, number one, that Hendricks was analogous, number two, to exclude the consideration of our primary combination, and ultimately his conclusion on obviousness we think was clearly wrong in view of precedent of this court, finding that under these circumstances where you do nothing more than pursue a path that's blazed for you and repeat a study to reach the result that's predicted, that cannot be invention. I will preserve my time if that's all right with you, Your Honors. That's fine. Yep. Okay. Thank you. Mr. Berkoff? Thank you, Your Honors. Molesville, the use of which is claimed in Claim 19, is a major life-saving advance. Before Molesville, up to 30% of the patients that needed a stem cell transplant to stay alive died. The argument, however, is that the research was on a path to discovering this, and it was just inevitable that they were going to get there, and so therefore this isn't really inventive, no matter how valuable it may be. So that's really the question. So can you speak to that? Of course. And that's precisely the argument that was presented to the district court, and the district court found that there were many factual findings that supported non-obviousness, including the great uncertainty in the art about what actually was behind stem cell mobilization. And this was great uncertainty not for persons of ordinary skill in the art. This was for persons of extraordinary skill in the art who were writing scientific papers at the time of the invention, saying that little was known about stem cell mobilization, that how it worked was elusive, and there were many unanswered questions. Even Dr. Skadden at trial admitted that we're still, as of the time of trial in 2015, at the edge of understanding, the beginning edge, those are his words, of stem cell mobilization. So your argument is different from opposing counsel's. He was arguing where the elements appear and why someone would be motivated to make the combination, and you instead, it seems to me, are focusing on the reasonable expectation of success, that even if he is right about everything he's saying, the level of unpredictability combined with the testimony of multiple witnesses about how very, very little, not just little was known, very, very little was known as the exact testimony about this, that all of that means that even if he's right about everything he says, the district court's fact-finding is still supported by substantial evidence for the reason you're articulating. Is that right? You don't seem to be addressing his arguments about Hendricks and whether it's analogous. You seem to be saying even if all of that is true, we still have this. We say both. Without question, the evidence and the findings in the district court strongly support that there was no reasonable expectation of success because of the great uncertainty and the high level of unpredictability in the field. So, yes, I agree with what Your Honor stated. And that's even if Hendricks is part of the relevant prior art. That's correct. But we also challenge that it is. Part of that great uncertainty, I suppose, may have arisen in the district court's mind because he said there was a presumption that decisions made by the PTO examiner are valid. Where did that idea come from? That was the last thing that he mentioned in the context of his finding that Hendricks is not analogous art. And he had already gone through the effort to establish the factual findings that Hendricks is in the HIV field, very different from the stem cell mobilization field. It wouldn't be logical for a person to look to Hendricks to solve stem cell mobilization. He then referred to the PTOs. But you just described those as the HIV field and the stem cell mobilization field. Well, one of them is related to treating a particular type of disease or virus. What is stem cell mobilization most relevant to? Hematology, Your Honor, and that, in fact, is how— Aren't most of the references in the cancer field, quite frankly, the stem cell mobilization is useful in treating cancer, correct? That's correct, Your Honor. Okay. Now, what was the name of the journal Hendricks was published in? It was the Antimicrobial and Chemotherapy Journal. And your argument, as I understand it, is that one of skill in the art who's looking in the field of stem cell mobilization to treat cancer would never have looked at an article in a journal whose title is chemotherapy. The finding by the district court was that, yes, a person looking for a better stem cell mobilizer would not be looking at that art and would not look at that journal, and that was supported by the evidence and the testimony unrebutted by Dr. Modi. What are the consequences to your position if we disagree with that? Disagree as to analogous art? Yes. Then it goes to the second point, which is that Hendricks, either in combination with 304 or in combination with the WO reference, does not create a prima facie case of obviousness and in any event would be overwhelmed by the strong secondary considerations found by the court. At this level, there's no such thing as a prima facie case of obviousness. So please, for my sake, drop that line. Hendricks, in this record. Here's the problem. We can't make that judgment. If Hendricks turns out to be analogous art, can we make the judgment as to whether Hendricks, in combination with 304, is sufficient to prove obviousness? That's a fact-finding. That is a fact-finding, and the district court already made that, Your Honor. The district court made it because you said Hendricks was not. I think he went beyond that, and if we could look at the district court's opinion at its Appendix 21, this is talking first about the 304 patent and its lack of connection to Hendricks. In the middle of that first paragraph, he says, Essentially, defendants argue, that Plurixafor would be expected to disrupt the tether between CXCR4 and SDF1 in the same way that VLA-4 does, thereby causing stem cell mobilizations. We respond, this is our argument, that there's no mention of CXCR4 and 304, and it's from a completely different family of receptors. The court then goes on to find that the 304's discussion of VLA-4 would not have rendered obvious Claim 19, which covers CXCR4 and not VLA-4. Yes, he made the statement. And then, in addition, now he goes on to deal with the combination. They want to combine the teachings, but you can't do that, because CXCR4, there's no bridge, there's no connection. You've wandered away from my earlier question. I'm sorry, Your Honor. My earlier question was, you made the point that the district court could have gotten here regardless of what's in the record on these things. But the district court said a couple of things that I'm puzzled about, and I quoted one of them to you, presumption that decisions made by the PTO examiner are valid. I asked you where you get that from. You haven't quite answered that. But he also said, what a POSA, P-O-S-A is the phrase he used, what a POSA would know with certainty. Is that a requirement for determining obviousness on the part of a POSA or making a judgment about it? Does it have to be known with certainty? I think that is – I'll try and answer the first question. I'm worried that the district court had some ideas. No, I think it's clear the district court knew the law. And it is, under this court's case law in Fronson, which we cite in our brief, it is perfectly acceptable to cite USPTO examiner findings as evidence. And that's all he did. In fact, he explicitly used that phrase. But he said there was a presumption. He did say that, but then he immediately went on and said that in light of the foregoing evidence, the court cannot conclude that Hendricks would logically have commended itself. So that's the answer to the first question. So it was appropriate. He had already done his analysis on the non-analogous art question. He looked at the examiner's statement as evidence. It is true that we do not judge opinions. We judge judgments. So we needn't pursue that. On the second question, he clearly states the law in his opinion correctly, that all you need is a reasonable expectation of success, and there's no question about that. But where he used the word certainty, he was discussing the speculations in Hendricks about what might be going on. The primary one, of course, we know, was demargination. And that does contrast with what he was looking for, was what would a poser know after reading Hendricks with certainty as opposed to mere speculation? Because this court in Star Scientific and in the more recent decision of Los Angeles Biomedical that came in after our briefing, this court has said that speculation in the prior art does not rise to the level that directs or suggests the person of skill in the art towards the invention. That's exactly what we have here. So I think the certainty language in this opinion is just sloppy and wrong. But I think what he was getting at was reasonable expectation of success. That's what all of the other statements would naturally lead me to. I don't know where he came up with this certainty idea. And this is an unusual case because we don't even need to guess how a person of ordinary skill in the art would interpret Hendricks. A nearly contemporaneous independent research article by the Suzuki Group cited Hendricks, described what it taught, and said it discloses that the CXCR4 antagonist, Pleryxifor, causes a demargination effect. Full stop. No mention of stem cells. So the district court had an absolutely solid basis for concluding that. But I guess the other side still has something in Hendricks to point to. The fact that Hendricks himself said the line, and or stem cells from bone marrow, i.e. causing the release of stem cells from bone marrow. So that's something you have to answer for. Why would Hendricks go out of his way to say that? Well, I can't speak for the law enforcement. Let me change the question. Why would he say it? Why wouldn't he say it unless he meant it? But we have to look at everything that the paper says. And that whole paragraph says, it could be this. It might be this. Let me repeat the question. Why wouldn't he say it unless he meant it? I assume they meant it, but there's no evidentiary experimental support for the statement in the paper. And a person of ordinary skill in the art is reading the whole paper. And they're recognizing that that's speculation. They're recognizing that demargination is the real belief of the authors, and that this six extra words on stem cells is more or less an unsupported throwaway. And they would also, in reading the whole reference, notice that there was no bone pain. And that, to a person of ordinary skill in the art, to me it wouldn't make a difference, but to a person of ordinary skill in the art, they would know that the prior art stem cell mobilization agents that had been approved by the FDA all caused bone pain. And Dr. Modi testified that that would mean to a POSA that there was no effect on the bone. Stop. When I'm asking a question, I need to stop. Did the VLA-4 antagonist cause bone pain? I don't believe there's any evidence in the record one way or the other on that. And I personally don't know. If there are no more questions from the panel, I will cede my time. Okay. Thank you. You have a little bit of a bottle of time left. Thank you, Your Honors. Just a couple of points I would like to make. Firstly, just regarding this bone pain issue, the testimony was uniform, that the reason for bone pain by prior agents, GCSF, was because it was a proliferating agent. I think I mentioned in my earlier presentation that proliferating agents result in massive amounts of stem cells being created in the marrow, packing the marrow, and ultimately causing the pain. There's no evidence that drugs that work by simply severing the tether between CXCR4 and SDF1 result in any such proliferation. Indeed, they don't, or cause any type of bone pain. So that was not unexpected at all. Secondly, with respect to this question that the six words, as my esteemed opposing counsel put it, six words are a throwaway speculation. Again, you must read the paragraph of Hendricks that we're talking about. He builds a logical explanation citing to the very articles we cite to as to the interaction between SDF1 and CXCR4 that anticipate or suggest that that tether is very important, that axis is very important for maintaining the stem cells in the marrow. And he cites those same papers. IUD is the first paper in his reference list on Appendix 12-289. He cites to PELID on Appendix 12-290. Some of these PELID, for example, involved in vivo mouse data, which show the importance of this tether in retaining B cells, progenitor cells, in the marrow. So this was not a speculation. I don't even know how to process the idea that six sentences are a throwaway. I don't know how to process that. But I don't know that it matters if there isn't a reasonable expectation of success. And that's what I read. For me, that is your biggest hurdle in this case. I mean, I'll tell you, I think Hendricks is analogous prior art. I do. I mean, I think Hendricks says what you say it says. Those six words are there, and I don't think they're a throwaway. But for me, where you don't prevail, and I'm going to give you a little extra time since I'm being so blunt with you, I don't want you to think I'm saying it and you don't get to respond, is on the reasonable expectation of success because I don't get to substitute my judgment for the fact finder's determination in that regard. You've got all these people saying there's very, very little known about it. It's very unpredictable. There's a lack of in vivo testing. You've got all this stuff. And to me, I mean, how am I supposed to replace my view, which is very unsophisticated and I wasn't present for the trial, with the fact finder's determination in light of all that evidence? Why isn't that substantial evidence for a conclusion, which is a question of fact on expectation of success? Because you can win on every other point you just talked about and still lose if you can't win that one. Thank you, Your Honor. Well, several things. Firstly, as I mentioned, I think that the explanation and building of reasonable points that the Hendricks authors themselves, three of which, by the way, are named inventors on the 590 patent. There's overlap here. What does that have to do with anything? Well, because I think a person... I mean, you're beyond your time, so try to address the most relevant and salient points you have. Okay, firstly, there was in vivo data. Okay, Ma and Pellet, we cite this in our reply brief, both dealt with mouse data and showed that there was a mobilization effect from this SDF-1, severing the SDF-1 CXCR4 using poryxophore. So they showed that. There was a reasonable knowledge. Persons aware of that would reasonably have expected that. And secondly, Your Honor, Dr. Dale himself, one of the inventors here, indicated when we asked him about that conclusion, and he's one of the named inventors, his response was that it was intuitive. He said, quote, There are not a lot of choices. It's not a very discriminating hypothesis. He himself said that. And that's at appendix page 2828. Dr. Modi, their expert, testified that Hendricks and his co-authors were, quote, building reasoning based on three logical steps arriving at their conclusion. So people skilled in the art, not somebody who made some comment to Suzuki Group about an article, but the people who were actually involved here, they said this was a reasonable conclusion. The expert did it. The inventor said it. He said it was intuitive. So, and again, it's an express statement to, hey, go do this. What more do you need? The trail was blazed. It says any person at this level of skill would have looked at this and said, there's a reasonable chance this will work. Let me try it. WBC increase often is a proxy for stem cell mobilization. They showed WBC increase, and they showed it was safe at the very dosages that are in the 590 patent. So, again, Your Honors, under these particular facts, I think there was more than a reasonable expectation of success. And so your basic position is that the trial judge clearly erred in what? I think he clearly erred in finding there was no reasonable expectation of success, and I think there was a clear error of law in finding that it was not obvious based on the combination that we had proposed. Okay. Thank you, Mr. Pavane. I thank both counsel for their argument. The case is taken under submission. Thank you, Your Honors.